UNITED STATES of America, Plaintiff,

v.

Henry Nathan TAYLOR and Rodney Dean Mullins, Defendants.

No. CR–80–21.

United States District Court, D. Oregon.

April 22, 1980.

Sidney I. Lezak, U. S. Atty., William W. Youngman, Asst. U. S. Atty., Portland, Or., for plaintiff.

Ted M. Miller, McCormick & Reynolds, Portland, Or., for defendants.

## OPINION

PANNER, Judge:

Defendants by motion to suppress have challenged the constitutionality of a search of the fishing vessel "Marian F." while the vessel was docked in Astoria, Oregon. The United States contends that the particular search was authorized by 16 U.S.C. § 772d(a), which provides as follows:

The provisions of the Convention and of this subchapter and any regulations issued under this subchapter shall be enforced by the Coast Guard, the Customs Service, and the National Oceanic and Atmospheric Administration. For such purposes any officer of the Coast Guard, Customs, or National Oceanic and Atmospheric Administration may at any time go on board of any vessel in territorial waters of the United States, or any vessel of the United States or Canada in Convention waters, except in the territorial waters of Canada, to address inquiries to those on board and to examine, inspect, and search the vessel and every part thereof and any person, trunk, package or cargo on board, and to this end may hail and stop such vessel, and use all necessary force to compel compliance.

There is no substantial dispute about the facts. Special agents of the National Oceanic and Atmospheric Administration were suspicious that halibut were being caught illegally by the commercial fishing boat "Piky". During the surveillance of the "Piky," they saw a box being thrown into a pickup from another vessel, the "Marian F.". The pickup then moved off at a high rate of speed. One of the officers, with an Oregon State Policeman, followed, stopped the pickup, and asked the driver, Mullins, as to the contents of the box. Mullins told them the box contained his laundry. Inspection confirmed the accuracy of his statement. They then advised Mullins they were going to search the "Marian F." and requested that he accompany them. He declined, advising that he was tired and was going home to bed. The officers told him that unless he returned with them and unlocked the vessel they would search it anyway. Mullins then agreed to return and unlock the vessel. On the search, the officers found four illegal halibut among some 10–12,000 pounds of fish. Possession was taken of the halibut and this challenge results.

Prior to the search, the officers involved had no reasonable or articulable suspicion to believe that the crew of the "Marian F." had violated any laws or that the "Marian F." contained any evidence of any violation. When the officers stopped the pickup, they had already made the decision to search the "Marian F." that evening with or without permission.

At the time the pickup was stopped and thereafter, Mullins did not feel he was free to leave and felt compelled to accompany the officers back to the "Marian F." to unlock the vessel. There was no implied or actual consent by Mullins or any party to authorize the search of the "Marian F.".

Mullins, along with the other members of the crew of the "Marian F.," had a possessory interest in the catch of roughly 12,000 pounds of fish by reason of the fact that they each owned a share.

The United States contends that under 16 U.S.C. § 772d(a) no warrant is necessary, no reasonable cause for search is required and that the officers can search any vessel at any time of the day or night at their individual discretion.

This section of the Northern Pacific Halibut Act has not been subject to judicial interpretation. The United States relies primarily upon Fifth Circuit interpretations of 14 U.S.C. § 89(a) (Coast Guard Statute). It allows Coast Guard officers to board any vessel at any time to address inquiries to

those on board, examine the ship's documents, inspect and search the vessel and to use all necessary force to compel compliance. The two statutes are very similar. Both permit boarding to occur at any time. Both permit the boarding of any vessel. The Halibut Act permits the search for the purpose of enforcing the Northern Pacific Halibut Act. The Coast Guard statute permits the search for the prevention, detection and suppression of violations that involve the United States generally. Neither explicitly requires reasonable cause or a warrant.

The Fifth Circuit, in *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (*en banc*), *rehearing en banc denied in part*, 586 F.2d 608, 609 (5th Cir.), *granted in part*, 589 F.2d 254 (5th Cir. 1979), found the Coast Guard statute constitutional and held that authority to apprehend and board a vessel is plenary when exercised beyond the twelve-mile limit. No particularized suspicion was required. In *Warren*, the boarding of the "Stormy Seas" occurred approximately 700 miles from the United States to conduct documentation and safety inspections. During the inspections, probable cause for search became apparent. In *United States v. Odom*, 526 F.2d 339 (5th Cir. 1976), the Court sustained a search by the Coast Guard 200 miles at sea, where the initial boarding was to conduct a routine safety and documentation inspection of the "Mar–J–May". Upon inspection and while searching for the main beam identification number, it was necessary to open the hold and marijuana was discovered. In *United States v. One (1) 43 Foot Sailing Vessel*, 538 F.2d 694 (5th Cir. 1976), the Coast Guard boarded the "Winds Will" at night, approximately 15 miles west of Cuba for a safety inspection. She was running without lights in the Yucatan Channel. After boarding, smell and plain view observations led to the discovery of 2,000 pounds of marijuana. The Court sustained forfeiture of the vessel.

The Ninth Circuit recently construed the Coast Guard statute in *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979). The Coast Guard boarded the 43-foot sailboat, the "Delphene," for a routine safety inspection on a random basis. There were no suspicious circumstances. The boarding occurred after dark at approximately 6:30 p. m. The "Delphene" was hailed, the cutter identified as Coast Guard and the "Delphene" was instructed to prepare to be boarded. As the boarding officer was displaying his credentials and advising that the boarding was for routine safety check, he observed through an open door what appeared to be bags of marijuana in plain view in a lighted cabin below the deck. The boat was seized and over two tons of marijuana were recovered. The Court, after evaluating the Fifth Circuit decisions and the decision in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), concluded that the random stop and boarding of a vessel after dark, for safety and registration inspection, without cause to suspect non-compliance, was not justified by the governmental need to enforce compliance with safety regulations and constituted a violation of the Fourth Amendment. The Court further held that a stop and boarding after dark must be for cause with at least a reasonable and articulable suspicion of noncompliance, or, in the alternative, must be conducted under administrative standards so drafted that the decision to search is not left to the sole discretion of the Coast Guard officers.

In another Fifth Circuit decision, the Court held that a customs officer under a similar statute[1] could stop a vessel within the customs waters without a warrant and without probable cause for a routine and documents check. *United States v. Freeman*, 579 F.2d 942 (5th Cir. 1978). The stop authorized by the Court occurred as the "Topographic Oceans" sailed through customs waters. The Court pointed out the substantial distinction between a land-locked vehicle and a nautical vessel for Fourth Amendment purposes:

> First, the national frontiers of the oceans are much more difficult to police than the

1. 19 U.S.C. § 1581(a).

478

territorial boundaries of the land. The exact lines are difficult to discern and there is no limit to the numbers of fixed points of entry. It's simply not practical to stop and inspect every vessel at the actual border, an imaginary line on the seas.

*Id.* at 946.

Other inspection statutes have been interpreted which are helpful. The Gun Control Act of 1968, 18 U.S.C. § 921, *et seq.*, authorizes official entry, during business hours, into the premises of any firearms dealer for the purpose of examining and inspecting any documents and any firearms kept by the dealer. The United States Supreme Court held this statute constitutional and approved a warrantless search without cause, relying on the premise that federal regulation of interstate traffic in firearms is of importance to prevent violent crime and to assist the states in regulating firearms traffic within their borders. *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

Other statutes [2] also allow entry, during business hours, onto the premises of any liquor dealer for the purpose of inspecting and examining records and documents. A separate section,[3] provides for a $500 fine in the event of refusal to allow inspection. The Supreme Court declined to permit the forcible entry in spite of the unlimited powers conferred by the statute and left the fine as the appropriate remedy for refusal. *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

In *Delaware v. Prouse, supra,* the state argued that it was essential that officers have the right to indiscriminately stop automobiles to check licenses and registrations without probable cause; because the state's interest in discretionary spot checks as a means of insuring the safety of its roadways outweighed the resulting intrusion on the privacy and security of the persons detained. The Court held that the Fourth Amendment precluded the stopping of an automobile and detention of the driver to check his license and the registration of the vehicle where there was no articulable and reasonable suspicion. The Court further held that the decision would not preclude states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion.

 The Fourth Amendment imposes a general reasonableness standard upon all searches and seizures. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). What is reasonable, of course, depends on the circumstances of each case. *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Where Congress has authorized inspection but has made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules must be applied. *Colonnade Catering Corp.,* 397 U.S. at 77, 90 S.Ct. at 777. The Halibut Act sets forth no standards. Inspection may be at any place or at any time. Under these circumstances the Fourth Amendment standards must be applied. The essential purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion. *Delaware v. Prouse,* 440 U.S. at 653–54, 99 S.Ct. at 1396. In those situations in which the balance of interests precludes insistence upon some quantum of individualized suspicion, other safeguards should be relied upon to insure that the individual's reasonable expectation of privacy is not subject to the official in the field. *Camara v. Municipal Court,* 387 U.S. 523, 532–35, 87 S.Ct. 1727, 1732–34, 18 L.Ed.2d 930 (1967).

 In this case, the United States urges absolutely no constraints. It is apparent from the evidence that the officers intended to break into the "Marian F." without a warrant or without any reasonable suspicion. The officers were following no guidelines or constraints. The search was conducted at night, based solely on the individ-

2. 26 U.S.C. §§ 5146(b), 7606.

3. 26 U.S.C. § 7342.

ual discretion of the officers and without cause. Such an interpretation of the statute would allow breaking and entering of any vessel at any time under any circumstances under the guise of searching for illegal halibut. The statute is not confined to commercial fishing vessels. Such discretion is unreasonable. Under the circumstances in this case, the defendants' motion to suppress is allowed.